HOLYOKE MUTUAL FIRE INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51780.    Filed April 23, 1957.

*Roger P. Stokey, Esq., Nicholas S. Kiefer, Esq.,* and *Charles D. Post, Esq.,* for the petitioner.

*Paul J. Henry, Esq.,* for the respondent.

TIETJENS, *Judge:* The respondent determined a deficiency in income tax for the calendar year 1950 in the amount of $4,695.28. The sole issue is whether the petitioner was during that year an insurance company other than mutual, and taxable under section 204, Internal Revenue Code of 1939, or a mutual insurance company other than life or marine, and taxable under section 207 of such Code. Some facts are stipulated.

### FINDINGS OF FACT.

The facts stipulated are so found and the exhibits to the stipulation are incorporated herein by this reference.

The petitioner is operating under the laws of Massachusetts and is engaged in the business of writing fire and allied lines of insurance in 15 States of the United States. Its principal office is in Salem, Massachusetts. Its income tax return for the year 1950 was filed on Form 1120M, entitled "Mutual Insurance Company Income Tax Return" with the collector of internal revenue at Boston.

The petitioner was chartered in 1843 under an act of the Legislature of Massachusetts. In 1872 an extensive fire in Boston caused large losses to many insurance companies doing business in Massachusetts. The petitioner paid losses of $203,486 incurred in that fire. These payments exhausted the petitioner's surplus. A special session of the legislature, called because of the fire, enacted chapter 375 of the Massachusetts Acts and Resolves for 1872 which authorized any existing mutual insurance company to acquire a guaranty capital. Pursuant to such statute the petitioner in 1873 acquired $100,000 in guaranty capital, divided in 1,000 shares, and at all times since has had this amount. The petitioner paid $5,000 to guaranty capital shareholders in 1873, $10,000 in each year from 1874 through 1880, and $7,000 in each year from 1881 through 1950. In 1950 the 1,000 shares of guaranty capital were owned by 68 persons. The largest number of shares held by one person was 55.

During 1950, the petitioner had over 100,000 policies of insurance in force and on December 31, 1950, the amount of its insurance in force was $365,708,453.

The petitioner's management is vested in the board of directors. The petitioner's bylaws provide for a board of from 8 to 12 directors, one-half to be chosen from the members and one-half from the guaranty capital shareholders. In 1950 the directors owned 97 shares.

Each policy issued by the petitioner contains the provision:

The Assured is hereby notified that by virtue of this policy he is a member of the HOLYOKE MUTUAL FIRE INSURANCE COMPANY IN SALEM, and is entitled to vote either in person or by proxy at any and all meetings of said company. The annual meetings are held at its home office on the fourth Tuesday of January in each year, at 10 : 00 o'clock A. M.

In 1950 all the officers of the petitioner were policyholders. The chairman of the board, the president, and the treasurer were shareholders.

During 1950 and for many years prior thereto the petitioner's net assets above its reinsurance reserves and all other claims and obligations have been less than 2 per cent of its insurance in force and have been more than 25 per cent of the amount of the guaranty capital.

Notice of the annual meeting is sent to all shareholders. Votes were cast at the annual meetings in 1950 and 1951 as follows:

|  | 1950 | 1951 |
|---|---|---|
| By policyholders in person | 49 | 54 |
| By shares of guaranty capital in person | 20 | 31 |
| By shares of guaranty capital by proxy | 684 | 682 |

For a number of years 6 of the 12 directors have been policyholders who were not shareholders, the other 6 have been shareholders, at least 5 of whom were also policyholders.

In 1950 the petitioner paid dividends to its policyholders amounting to $474,021.49. During the year 1950 and all years prior thereto the petitioner furnished insurance to its policyholders at cost after payment of losses and expenses, establishment of reserves for losses incurred and for unearned premiums on policies outstanding, retention of surplus to meet unusual losses, and payment of $7,000 each year to shareholders of guaranty capital.

The petitioner has been subject to catastrophe losses in the past, including fires in Portland in 1866, Boston in 1872, Chelsea in 1906, Salem in 1914, and Fall River in 1932, and hurricanes in 1938, 1944, and 1950.

In its annual statement on the form approved by the National Convention of Insurance Commissioners the petitioner lists the payment to the shareholders as a reduction to surplus and describes it as dividends to shareholders of guaranty capital, and pursuant to instructions on the form lists its guaranty capital in the capital stock section of its balance sheet and not among its liabilities.

The petitioner is a mutual insurance company.

## OPINION.

The petitioner was organized as a mutual insurance company and throughout its existence has classified itself as such. However, since 1873 it has had a guaranty capital of $100,000, divided into 1,000

shares, the holders of these shares being entitled to receive cumulative dividends of 3½ per cent semiannually, to choose one-half of the directors, and to receive on liquidation the face amount of their shares. The respondent takes the position that the guaranty capital is equivalent to stock and therefore the petitioner cannot be classified as a mutual insurance company taxable under section 207 [1] of the Internal Revenue Code of 1939, but is subject to tax under section 204 [2] as an insurance company other than life or mutual.

The General Laws of Massachusetts, chapter 175, as applicable in 1950, contain several pertinent provisions. Section 76 provides that every person insured by a mutual fire insurance company shall be a member while his policy is in force, entitled to one vote for each policy held and shall be notified of meetings by written notice or by printing on the policy, and that members may vote by proxy. Section 77 provides for election of a board of directors and states:

> After the first election members only shall be eligible, but no director shall be disqualified from serving the term for which he was elected by reason of the termination of his policy. Such companies having a guaranty capital shall choose one half of the directors from the shareholders and one half from the policyholders who are not shareholders.

Section 79 provides that holders of shares of guaranty capital are entitled to a semiannual dividend of not more than 3½ per cent if the net profits shall be sufficient and that the guaranty capital shall be applied to pay losses only when the company has exhausted its assets other than uncollected premiums and when impaired it may be restored by assessments upon the contingent funds of the company. Upon liquidation the holders of guaranty capital are not entitled to share in the distribution of the assets beyond the par value of the shares and any dividends declared and payable thereon. This section also states the conditions upon which the guaranty capital shall be

---

[1] SEC. 207. MUTUAL INSURANCE COMPANIES OTHER THAN LIFE OR MARINE.
(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year upon the income of every mutual insurance company (other than a life or a marine insurance company or a fire insurance company subject to the tax imposed by section 204 and other than an interinsurer or reciprocal underwriter) a tax computed under paragraph (1) or paragraph (2) whichever is the greater and upon the income of every mutual insurance company (other than a life or marine insurance company or a fire insurance company subject to the tax imposed by section 204) which is an interinsurer or reciprocal underwriter, a tax computed under paragraph (3) ; * * *

[2] SEC. 204. INSURANCE COMPANIES OTHER THAN LIFE OR MUTUAL.
(a) IMPOSITION OF TAX.—
(1) IN GENERAL.—There shall be levied, collected, and paid for each taxable year upon the normal-tax net income and upon the corporation surtax net income of every insurance company (other than a life or mutual insurance company) and every mutual marine insurance company and every mutual fire insurance company exclusively issuing either perpetual policies, or policies for which the sole premium charged is a single deposit which (except for such deduction of underwriting costs as may be provided) is refundable upon cancellation or expiration of the policy taxes computed as provided in section 13 (b) and in section 15 (b).

retired, or may be retired.[3]  Section 80 provides that the directors may fix the percentages of dividends to be paid, and authorizes a mutual fire insurance company to accumulate and hold profits, but only until such profits equal 4 per cent of its insurance in force.

The respondent says that the company is controlled by its stockholders, the holders of shares of guaranty capital, and therefore is not a mutual insurance company.  These factors are pointed out as significant: (1) The shareholders are subject to the same provisions of law as stockholders in stock companies; (2) they have one vote for each share owned in the choice of directors; (3) they have the right to choose one-half of the directors; (4) the guaranty capital is applied to pay losses only if other assets are exhausted and any impairment in the guaranty capital can be restored from contingent funds of the company; (5) the shareholders are entitled to cumulative dividends of a fixed amount; and (6) on dissolution the shareholders are entitled to receive the par value of their shares plus any dividends declared and payable.

The respondent points out that votes cast at the annual meetings of 1950 and 1951 represented principally shares of guaranty capital rather than policyholders, and says that this shows that the democratic control by policyholders which is the essence of a mutual insurance company is lacking.

It is not disputed that the petitioner is classified under the laws of Massachusetts and all the other States in which it does business as being a mutual insurance company, nor that it is a member of various trade associations of mutual insurance companies.  The respondent says these evidences are irrelevant to the question whether the petitioner is within the classification under the Federal taxing statutes, citing *Postal Mutual Indemnity Co.* v. *Commissioner*, 147 F. 2d 583 (C. A. 5, 1945), affirming 3 T. C. 1212 (1944).

A mutual insurance company is not defined in the Internal Revenue Codes but is generally defined as an association of persons having the object of obtaining insurance at cost and having the characteristics of common equitable ownership of the assets by the members, the right of all policyholders to be members to the exclusion of other persons and to choose the management, the conduct of the business to the sole end that the cost of the insurance be reduced, and the right

[3] Massachusetts General Laws, chapter 175, section 79 : Such guaranty capital shall be retired by the directors of the company at par when the profits accumulated under section eighty equal two per cent of its insurance in force ; and such guaranty capital may, upon the recording in favor of such action of two thirds of the votes cast at a meeting duly called for the purpose and with the written approval of the commissioner, be reduced or retired, if the net assets of the company above its reinsurance reserve and all other claims and obligations, exclusive of guaranty capital, for two years last preceding and including the date of its last annual statement under section twenty-five has been not less than twenty-five per cent of the amount of the guaranty capital. * * *

of the members to a return of the premiums paid in excess of the amounts necessary to cover losses and expenses. *Mutual Fire, Marine & Inland Insurance Co.*, 8 T. C. 1212 (1947), acq., 1947–2 C. B. 3. As was pointed out in *Penn Mutual Life Insurance Co.* v. *Lederer*, 252 U. S. 523 (1920), in a mutual company the premium is necessarily greater than the expected cost, the excess furnishing a guaranty fund out of which extraordinary losses may be met. A mutual insurance company may properly retain from its earnings an amount sufficient to secure its policyholders in the future as well as the present and to cover any contingencies that may be fairly anticipated. *Order of Railway Employees*, 2 T. C. 607, 615 (1943), appeal dismissed (C. A. 9, 1944) 143 F. 2d 597.

The petitioner's directors are all required to be policyholders (section 77, quoted above). The respondent contends otherwise, saying that half the directors must be shareholders who need not be policyholders. But we read the clause "members only shall be eligible" as requiring all directors to be members, that is, policyholders, half of them to be also shareholders and half not shareholders. In this situation the company is managed solely by its policyholders. It is stipulated that 11 of the 12 directors in 1950 were policyholders and the records are incomplete as to one director, since deceased. The respondent argues from this that if the petitioner's interpretation of the statute is correct, we do not know whether the petitioner complied with the law. But in the absence of affirmative evidence we would not assume that the statute was disregarded.

The respondent says that this company is dominated by the shareholders, since the voters at the annual meeting represent but a few policyholders while more than half the shares of guaranty capital are voted. It is also contended that one shareholder at such a meeting could elect half the board of directors while 100,000 policyholders elected the other half. If this is true it may be pointed out that the converse is also true, one policyholder present could elect half the board while 1,000 shares of guaranty capital chose the other half. There appears to be some question whether the shareholders and policyholders vote separately or as a single group, but we consider it unnecessary to resolve the point. All policyholders have the right to attend and vote and the taxable status of the petitioner does not depend upon the number who exercise this right.

The directors who are shareholders are no doubt expected to protect the interests of the shareholders by seeing that sound management practices are followed and the solvency of the company is not jeopardized. This responsibility is not inconsistent with the responsibilities of these and the other directors of providing insurance at cost, as

nearly as may be, to the members. It is stipulated that insurance was furnished to the members at cost after payment of losses and expenses, establishment of required reserves, and payment to shareholders of $7,000 each year. Since the amount of the annual payments to the shareholders and the amount they may receive on liquidation is fixed by law, there is no reason to assume that the shareholder-directors are influencing the management to the detriment or exclusion of the policyholders. Their function is analogous in some respects to creditors' representatives in other situations who participate in management of a business to protect the creditors' interests, but here they are at the same time policyholders interested in protecting their own interests as such. The comparative importance of these interests is shown by the fact that the dividends to policyholders amounted in 1950 to $474,000 while $7,000 was paid to the shareholders.

The guaranty capital is not equivalent to common stock, for the shareholders are not entitled to participate in the profits beyond the payments fixed by law. These have been said to be in the nature of interest. *Commonwealth* v. *Berkshire Life Insurance Co.*, 98 Mass. 25 (1867).

The annual statements report losses of $888,000 for 1950 and $641,000 for 1949. The assets were $6,180,000 and the surplus as regards policyholders was over $3,000,000 at the end of 1950 in addition to the guaranty capital. The accumulation was less than 1 per cent of the insurance in force and the State law permits an accumulation up to 4 per cent (section 80). The $100,000 of guaranty capital, which originally provided a needed cushion to guard against catastrophe losses, is not now a vital part of the financial structure nor a major concern of the directors. Under the State law this guaranty capital could be retired (section 79). We conclude that the petitioner is a mutual insurance company within the meaning of section 207 of the 1939 Code.

This conclusion is consonant with an interpretation which was long a part of the Treasury regulations. For many years the regulations provided:

A mutual fire insurance company which has a guaranty capital is taxed like other mutual fire insurance companies. A stock fire insurance company, operated on the mutual plan to the extent of paying dividends to certain classes of policyholders, may make a return on the same basis as a mutual fire insurance company with respect to its business conducted on the mutual plan.[4]

The first of these regulations related to the Revenue Act of 1918 and this provision continued in effect until 1943. In Regulations 111, promulgated in 1943, relating to the Internal Revenue Code of 1939 and

---

[4] Regs. 62, art. 572 ; Regs. 65, art. 571 ; Regs. 69, art. 571 ; Regs. 74, art. 1014 ; Regs. 77, art. 1014 ; Regs. 86, art. 207–1, as amended by T. D. 4697, XV–2 C. B. 197 (1936) ; Regs. 94, art. 207–6 ; Regs. 101, art. 207–6 ; Regs. 103, sec. 19.207–6.

effective for years beginning after 1941, this provision was not included. No language providing otherwise appears in such regulations. The petitioner argues that the provision should be deemed to have congressional approval through the reenactment of the related statutes and to have the force of law, citing *Helvering* v. *Winmill*, 305 U. S. 79, 83 (1938). In the cited case the Court said:

Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received Congressional approval and have the effect of law.

The respondent admits that the regulations so provided and explains that the change was prompted by a criticism from the Court of Appeals in *Keystone Automobile C. Cas. Co.* v. *Commissioner*, 122 F. 2d 886 (C. A. 3, 1941), holding invalid or ineffective part of article 1014 of Regulations 74, quoted above, purporting to authorize a stock company to make a return on the same basis as a mutual with respect to part of its business. The court held that the regulations could not amend the statute by granting an exemption or deduction not provided in the statute. The Treasury thereupon reconsidered the above-quoted provisions and in Regulations 111 omitted them. The change in administrative practice to conform to the foregoing decision is said to be warranted by *Estate of Sanford* v. *Commissioner*, 308 U. S. 39 (1939), and *Morrissey* v. *Commissioner*, 296 U. S. 344 (1935).

The petitioner cites the recent case of *United States* v. *Leslie Salt Co.*, 350 U. S. 383 (1956), in which the Court said:

In Norwegian Nitrogen Products Co. v. United States, 288 U. S. 294, 315, 53 S. Ct. 350, 358, 77 L. Ed. 796, Mr. Justice Cardozo said:

"administrative practice, consistent and generally unchallenged, will not be overturned except for very cogent reasons if the scope of the command is indefinite and doubtful. United States v. Moore, 95 U. S. 760, 763, 24 L. Ed. 588; Logan v. Davis, 233 U. S. 613, 627, 34 S. Ct. 685, 58 L. Ed. 1121; Brewster v. Gage, 280 U. S. 327, 336, 50 S. Ct. 115, 74 L. Ed. 457; Fawcus Machine Co. v. United States, 282 U. S. 375, 51 S. Ct. 144, 75 L. Ed. 397; Interstate Commerce Commn. v. New York, N. H. & H. R. Co., 287 U. S. 178, 53 S. Ct. 106, 77 L. Ed. 248 * * *. The practice has peculiar weight when it involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."

Against the Treasury's prior longstanding and consistent administrative interpretation its more recent *ad hoc* contention as to how the statute should be construed cannot stand. Moreover, that original interpretation has had both express and implied congressional acquiescence, through the 1918 amendment to the statute (76 S. Ct. 421), which has ever since continued in effect, and through Congress having let the administrative interpretation remain undisturbed for so many years. See Corn Products Refining Co. v. Commissioner, 350 U. S. 46, 53, 76 S. Ct. 20, 24; Norwegian Nitrogen Products Co. v. United States, supra, 288 U. S. at page 313, 53 S. Ct. at page 357. * * *

The provision in the regulations that a mutual insurance company having a guaranty capital is taxed like other mutual insurance companies was not involved in the *Keystone* case, *supra*, and apparently was not the subject of the criticism of the Court of Appeals for the Third Circuit. Having stood from 1918 to 1943 without any substantial change in the law, it should be regarded as having congressional approval.

The Internal Revenue Service at one time proposed to change its position on this point in G. C. M. 6782, VIII-2 C. B. 209 (1929). This memorandum held that a mutual insurance company having a guaranty capital was not exempted from taxation by section 231 (11) of the Revenue Act of 1926. This ruling was later modified since it was contrary to existing regulations.

The Internal Revenue Service has issued several rulings on the status of this petitioner. In 1926 it held that the petitioner was exempt under section 231 (11) of the Revenue Act of 1926 from income tax. In 1930, based upon G. C. M. 6782, *supra*, it held that the petitioner was not entitled to exemption. In 1936 it held that the petitioner was exempt under section 101 (11) of the Revenue Act of 1934 and corresponding sections of prior acts.

The Revenue Act of 1942 changed the exemption provided in section 101 (11), Internal Revenue Code of 1939, limiting the mutual insurance companies exempted from income tax to those with gross incomes of not more than $75,000. It made no change in the provisions of sections 204 or 207. In the Revenue Act of 1943, section 204 was amended to include as taxable thereunder mutual fire insurance companies exclusively issuing either perpetual policies or policies issued for a single refundable deposit. Section 207 was amended to exclude such companies. It would appear that the Congress considered the taxable status of mutual fire insurance companies and made this one change. Since it did not provide for taxing under section 204 mutual fire insurance companies having a guaranty capital when these sections were under consideration, it is reasonable to conclude that such a change from the earlier administrative practice was not intended. No further amendments were made to section 204 or section 207 after 1943 and prior to the taxable year 1950.

Since the administrative interpretation remained undisturbed by the Congress for many years it had implied congressional approval. Any change such as the respondent seeks here should be a matter for the Congress.

*Decision will be entered for the petitioner.*